**Raymond K. HOFFMAN, Plaintiff,**

v.

**Elizabeth ROBERTO, Walter L. Wittenberg, Durwood Young, Lawrence Parrott, Kevin Cash, William A. Nolan, Michael L. Fayette, Nancy Loomis, Lonnie Wilson, Richard Nelson, James Curcio, Jackie Presser, and International Brotherhood of Teamsters, Warehousemen, Chauffeurs and Helpers of America, Individually, Jointly and Severally, Defendants.**

**Raymond K. HOFFMAN, Plaintiff,**

v.

**Elizabeth ROBERTO, Walter L. Wittenberg, Durwood Young, Lawrence Parrott, Kevin Cash, William A. Nolan, Michael L. Fayette, Nancy Loomis, Lonnie Wilson, Richard Nelson, James Curcio, Jackie Presser, and # 44 International Brotherhood of Teamsters, Warehousemen, Chauffeurs and Helpers of America, Individually, Jointly and Severally, Defendants.**

Nos. K84–559, K85–101.

United States District Court, W.D. Michigan.

Oct. 22, 1987.

J. Clarke Nims, Gruel, Mills, Nims & Pylman, Grand Rapids, Mich., for plaintiff.

Frederick Perillo, Goldberg, Previant, Uelmen, Gratz, Miller & Brueggeman, S.C., Milwaukee, Wis., H. David Soet, Pinsky, Smith & Soet, Grand Rapids, Mich., for defendants Presser & Teamsters.

John R. Climaco, Dennis R. Wilcox, John B. Webster, Climaco, Climaco, Seminatore & Lefkowitz, Co. L.P.A., Cleveland, Ohio, for defendant Presser.

John D. Tully, Robert H. Skilton, Warner, Norcross & Judd, Grand Rapids, Mich., for defendants Roberto, Wittenberg, Young, Parrott, Cash, Nolan, Fayette, Loomis, Wilson, Nelson & Curcio.

## OPINION

ENSLEN, District Judge.

Pending before the Court in this action are motions for summary judgment by defendants Jackie Presser and the International Brotherhood of Teamsters, Warehousemen, Chauffeurs and Helpers of America (the "union"). Defendants filed their motions on August 14, 1987. For the reasons discussed below, the Court will deny both motions.

### Facts

This case arises out of bankruptcy proceedings pending before the bankruptcy court in this district involving a company named Tucker Freight Lines, Inc. Plaintiff was the president of Tucker Freight Lines, Inc. ("Tucker") from March, 1983 until June 24, 1984. After losing his position with Tucker, plaintiff has been unable to find employment in the trucking industry. Defendants Roberto, Wittenberg, Young, Parrott, Cash, Nolan, Fayette, and Loomis are members of the Official Unsecured Creditors' Committee in the bankruptcy action. Defendants Presser and the union are involved in this action for purposes of Count V of the plaintiff's second amended complaint and Count VII of plaintiff's third amended complaint, alleging defamation and tortious interference with business relations, respectively.

Plaintiff's complaints against Presser and the union involve two telexes sent by Presser, in his capacity as Chairman of the union's National Freight Industry Negotiating Committee, to union locals with members employed by Tucker. The telexes, sent on December 23, 1983 and January 17, 1984, purported to inform the locals of the status of the bankruptcy proceedings pending against Tucker. Plaintiff alleges that Presser and the union defamed him in the January telex and that, by sending both telexes, they intentionally interfered with his prospective business relationships in the trucking industry.

On September 24, 1986, this Court dismissed a portion of plaintiff's complaint against defendant Presser. In that opinion, the Court ruled that plaintiff's cause of action for defamation arising out of the December 23, 1983 telex was time barred, but declined to dismiss the cause of action as it related to the January 17, 1984 telex. In addition, the Court denied Presser's motion to dismiss Count VI while ordering the plaintiff to file yet another amended complaint to conform his allegations more closely to the requirements of Michigan law on the cause of action for intentional interference with prospective business relationships. Plaintiff filed his third amended complaint on October 21, 1986. Defendants now seek summary judgment on Counts V and VII of the plaintiff's second and third amended complaints.

In Count V of his second amended complaint, plaintiff alleges that the defendants defamed him by mischaracterizing and falsifying certain actions taken by the bankruptcy court. The January 17, 1984 telex purports to inform local unions of the bankruptcy judge's reasons for appointing a trustee to oversee the operation of Tucker Freight Lines, Inc. The telex alleges that certain improprieties led to the appointment of a trustee in that case. The telex lists twelve reasons, or "factors," which purportedly convinced the bankruptcy judge to appoint a trustee. Many of these actions, if taken, might be considered improper by persons in the trucking industry. Shapiro Deposition at 19.

### Standard

In considering a motion for summary judgment, the narrow questions presented to this Court are whether there is "no genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." F.R.Civ. Proc. 56(c). The Court cannot try issues of fact on a rule 56 motion, but is empowered to determine only whether there are issues to be tried. *In re Atlas Concrete Pipe Inc.*, 668 F.2d 905, 908 (6th Cir.1982).

The moving party has a right to summary judgment where that party is able to demonstrate, prior to trial, that the claims of the plaintiff have no factual basis. *Celotex Corporation v. Catrett*, 477 U.S. 317,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the Supreme Court held in *Celotex*, "... the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552–53, 91 L.Ed.2d at 273. The standard for granting a motion for summary judgment is essentially the same as that for granting a motion for a directed verdict. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986). The moving party is not entitled to summary judgment where there is sufficient evidence to allow a reasonably jury to return a verdict for the nonmoving party. *Id.* at 247–48, 106 S.Ct. at 2509–10, 91 L.Ed.2d at 211–12. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216. With this standard in mind, the Court will review the arguments presented by both parties.

### *Discussion*

#### A. *Count V—Defamation*

■ Defendants argue that they are entitled to summary judgment on Count V because plaintiff has failed to establish an essential element of his case on that count. In order to prevail on a defamation claim, under Michigan law, the plaintiff must plead and prove the following:

(a) a false and defamatory statement concerning plaintiff; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation *per quod*).

*Ledl v. Quick Pik Food Stores, Inc.*, 133 Mich.App. 583, 394 N.W.2d 529 (1984). A statement is defamatory if "it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating with him." *Nuyen v. Slater*, 372 Mich. 654, 662, 127 N.W.2d 369 (1964). The allegedly defamatory statements must be read in the context of the entire statement. *Letter Carriers v. Austin*, 418 U.S. 264, 287, 94 S.Ct. 2770, 2783, 41 L.Ed.2d 745 (1974). Although the Court must determine, as a matter of law, whether the statements are reasonably capable of a defamatory interpretation, where a statement is capable of at least two interpretations, one defamatory and the other non-defamatory, summary judgment is inappropriate. *Clark v. American Broadcasting Companies, Inc.*, 684 F.2d 1208, 1213 (6th Cir.1982) (applying Michigan law). If a statement is capable of sustaining both a defamatory and a non-defamatory interpretation, then it is for the jury to decide whether it was understood as being defamatory. *Id.* at 1214.

■ In this case, the defendants argue that plaintiff has failed to establish that the statements made in the January 17, 1984 telex were reasonably capable of a defamatory interpretation. Defendants argue that the majority of the statements in the telex do not refer to plaintiff, and that the one which does refer to plaintiff is true. Truth is a complete defense to a defamation charge. *See, Curtis Publishing Co. v. Butts*, 388 U.S. 130, 151, 87 S.Ct. 1975, 1989, 18 L.Ed.2d 1094 (1967). Plaintiff responds that the statements are defamatory because they relate to actions which, if taken, would tend to damage his reputation in the trucking industry. Further, plaintiff argues that the statements were made concerning him since, as president of Tucker, he would have been the individual responsible for all of the alleged improprieties. Plaintiff argues, alternatively, that this could be construed as a case of group libel. Even if the statements did not identify him specifically, they related to a small group of individuals (the management of Tucker) of which he was a member, and they alleged that those indi-

viduals took actions inconsistent with their obligations as managers of Tucker.

Since the January 17, 1984 telex purports to inform union locals of Judge Howard's reasons for appointing a trustee in the bankruptcy proceedings, the issue is not whether the telex accurately reflects the state of affairs at Tucker in January 1984, but whether it accurately summarizes Judge Howard's January 16, 1984 bench opinion. After reviewing the telex and the transcript of that bench opinion, this Court finds that portions of the telex are reasonably capable of a defamatory interpretation. Plaintiff points to six such statements; the Court agrees with respect to three of those statements.

Item one states that "Central Transport, a competitor of Tucker, exercised actual control over the operations." Plaintiff's Exhibit 2. This statement is partially true, and partially false. While Judge Howard apparently found that Central controlled Tucker, *see*, Transcript of January 16, 1984 Hearing at 240 (hereinafter "Transcript"), he also found that the fact of control was not a factor in his decision to appoint a trustee. In Judge Howard's words, "I do believe the testimony here is very weak to show that Central Transport or any of its affiliates have taken any action to deplete this corporation, or to take away the accounts of the debtor." *Id.* Admittedly, Judge Howard's opinion is not always clear; it is often difficult to determine whether he is speaking of Central or of Tucker when he describes actions taken by "the debtor" or "management." It is this Court's opinion, however, that Judge Howard was bothered more by Central's apparent lack of communication and cooperation with the creditor's committee, than by the fact that Central controlled Tucker. *See e.g.*, Transcript at 243 ("I think perhaps the most critical think [sic] in this case is the obvious lack of confidence that the creditors' committee has in management"). Thus this Court concludes that item one of the January 17, 1984 telex is false—Central's control over Tucker was not a reason for Judge Howard's appointment of a trustee.

Further, it appears to this Court that the statement is reasonably capable of a defamatory interpretation. The fact that it is included in the telex indicates Presser's and the union's belief that Central's control over Tucker was improper. While this may not have been the case (indeed, the transcript reveals that Central acquired control through a legal stock purchase agreement) a reasonable reader of the telex, unfamiliar with bankruptcy law or with the transfer of Tucker's stock to Central, could believe that this impropriety was the fault of Tucker management. In other words, a reader could reasonably draw the conclusion that Central should be not be exercising control over Tucker and that the individuals responsible for that fact were guilty of some sort of improper dealings.

Plaintiff next points to item two of the January telex. That item states "Tucker suffered greater losses after Central acquired the company." This Court agrees with defendants that this statement is not capable of a defamatory interpretation because it is true. Judge Howard recognized that it is not unusual for companies going through a Chapter 11 proceeding to lose money in the first few weeks after filing the petition. Nevertheless, he found that the heavy losses sustained by Tucker after Central acquired control of it were one of the factors resulting in a loss of confidence by the creditor's committee. The creditor's committee's lack of confidence in Tucker's management was the major factor influencing Judge Howard's decision to appoint a trustee. Since this item is true, it is not capable of a defamatory interpretation.

Item three of the telex alleged that "accounts handled by Tucker were diverted to Central." Plaintiff's Exhibit 2. This item is both false and capable of a defamatory interpretation. It is false because Judge Howard found that Tucker was not responsible for diverting any accounts to Central, and that Central was not responsible for depleting any of Tucker's accounts. Transcript at 237–38, 240. Moreover, it is arguably defamatory because it suggests that the diversion of accounts was improper and that it was the fault of Tucker management. A reasonable person in the trucking

industry might well be alarmed by this statement since it implies that plaintiff, or other managers of Tucker, was in the business of selling his company's accounts to other firms.

Plaintiff next points to item four of the telex. This item states, "The company unilaterally reduced the wages of the Union members in violation of the contract and ran the risk of a damaging strike." Plaintiff's Exhibit 2. Unlike item three, this item is true. Judge Howard found that Tucker unilaterally reduced the wages of its workers and that this reduction in wages nearly caused a strike. Transcript at 240. It is true, as plaintiff points out, that Judge Howard found Tucker's wage reduction arguably justifiable. *Id.* at 241. It is also true that this action was one of his reasons for appointing a trustee because it typified for him the lack of cooperation between the creditor's committee and the debtor. *Id.* This lack of cooperation was one of his primary reasons for appointing a trustee. *Id.* at 244.

While the telex may have overstated the importance of this action to Judge Howard's decision, it certainly was not false. Therefore, it cannot be the basis of a defamation action.

Item five of the telex states that "At the time of the wage cut, Ray Hoffman was given a salary increase." Plaintiff's Exhibit 2. Plaintiff argues that this statement is false because it was not a reason behind the appointment of the trustee. Defendant argues that it cannot form the basis of a defamation claim since it is true—Hoffman did in fact receive a salary increase in 1983. See, Transcript at 241–42. This Court agrees with the defendants. Judge Howard found that plaintiff's salary increase was not "significant in the overall purview of this case." *Id.* Nevertheless, he found that the salary increase was another example of non-cooperation with the creditor's committee—the major reason for the appointment of a trustee. While the telex overstates the importance of that fact to Judge Howard's action, it is not false and thus cannot form the basis of a defamation action.

Finally, plaintiff points to item ten of the telex, which reads, "The company closed down the operations but retained nonunion management personnel with no work to perform." Plaintiff's Exhibit 2 at 2. This Court agrees with plaintiff that this item is false. Nowhere in its opinion does the bankruptcy court mention this allegation. While the bankruptcy court found that certain terminals had been closed, it never found that nonunion personnel were retained with no work to perform. The Court also agrees that this statement is capable of a defamatory interpretation. The statement essentially accuses plaintiff of wasting his company's assets by retaining workers who had no duties to perform. Such an accusation, if believed, would lead a reasonable individual to believe that plaintiff was an incompetent or dishonest manager.

Thus, after reviewing the telex and the bankruptcy court's bench opinion, this Court finds that certain material statements in the telex are both false and capable of a defamatory interpretation. These include items one, three, and ten of the telex. Taken together, these items could tend to damage plaintiff's reputation as a skillful and honest manager in the trucking industry. Since the Court finds that the items are reasonably capable of a defamatory interpretation, it will deny the motions for summary judgment.

Defendant argues further that the statements were not made concerning plaintiff—that taken as a whole, the comments refer to Central and not to Tucker or Tucker's management. The Court disagrees. First, a reasonable reader might conclude that the statement referred to plaintiff as an individual. "A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer." Restatement (Second) of Torts section 564 (1977). *See also, Michigan United Conservation Clubs v. CBS News,* 485 F.Supp. 893, 897 (W.D.Mich. 1980); *affirmed,* 665 F.2d 110 (6th Cir. 1981). It would not be unreasonable to read this telex as referring to plaintiff and

Tucker rather than to Central. First, the telex mentions both Tucker and plaintiff. It was published to individuals who were familiar with Tucker and Tucker's management and who, as plaintiff argues, might believe that if anyone took the actions alleged in the telex it would have been plaintiff. In addition, the telex mentions Hoffman by name, without describing his connection to the proceedings or the position he held at Tucker. This implies to the Court that the readers not only knew who Hoffman was, but understood what his position and responsibilities were. Thus, a question of fact remains as to whether they interpreted the telex to refer to Hoffman, and whether they understood it to be defamatory. So long as the telex is capable of more than one interpretation, summary judgment is inappropriate. *See, Clark* at 1214.

█ In addition, the plaintiff correctly points out that this may be treated as a cause of action for group libel. The general rule, under Michigan law, is that a member of a group may not recover for libel directed at the entire group. *Chapman v. Romney*, 6 Mich.App. 36, 39, 148 N.W.2d 230 (1967). However, *Lins v. Evening News Association*, 129 Mich.App. 419, 427, 342 N.W.2d 573 (1983) recognizes an exception to this rule. In that case, two officers of a Teamster's Union local were allowed to maintain an action for libel against a newspaper which referred to the local's leaders as "thieves," "thugs," "stupid men," and "animals." *Id.* at 422, 342 N.W. 2d 573. The *Lins* court held that members of a defamed group could maintain an action for defamation "where a small group is defamed and plaintiff's identity is readily ascertainable from the content of the publication." *Id.* at 427, 342 N.W.2d 573. Since both plaintiffs were named in other parts of the article and since the number of leaders was small, the court allowed the plaintiffs to maintain their action for defamation.

The Court finds that *Lins* applies to the case at bar. The telex mentions Hoffman by name. It refers to a relatively small group of individuals—the managers of Tucker. It implicitly accuses those individuals of misconduct in their business affairs. It was directed toward readers who knew Hoffman and understood his role in the management of Tucker. It could reasonably be considered to refer to Hoffman under these circumstances. A jury will have to determine whether it actually referred to him. *Clark* at 1214. This Court's only function is to decide whether the jury could do so on the facts presented, and it finds that it could. Therefore, summary judgment is inappropriate.

Defendants next argue that the communication is entitled to a qualified privilege under Michigan law, since it concerns a matter of common interest between the publisher, defendants, and the recipients, the locals. Defendants argue that the locals had a need to be informed of the progress of the bankruptcy proceedings, since their jobs may have hung in the balance, and that they, as representatives of the locals, had a duty to provide this information to them. Plaintiff contends that the locals had no need to be informed of the appointment of a trustee, since that did not affect them in any way. Even if they had an interest in learning of the appointment of the trustee, plaintiff argues, they had no need to know the judge's reasons for taking that action.

Under Michigan law, a qualified privilege exists for:

> all communications made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation.

*Postill v. Booth Newspapers, Inc.*, 118 Mich.App. 608, 621, 325 N.W.2d 511 (1982). Once the existence of the qualified privilege is established, a presumption exists that the communication alleged to be defamatory was made in good faith and with a proper motive. *Tumbarella v. The Kroger Co.*, 85 Mich.App. 482, 494, 271 N.W.2d 284 (1978); *Wynn v. Cole*, 68 Mich.App.

706, 714, 243 N.W.2d 923 (1976). "Where a qualified privilege exists, plaintiff must prove actual malice in order to recover, i.e., must prove that the communication was made with knowledge of its falsity or with reckless disregard for the truth." *Tumbarella* 85 Mich.App. at 494, 271 N.W.2d 284 (*citing, New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). While Michigan's appellate courts have, at times differed on the definition of actual malice in this context, *see, e.g., Wynn v. Cole,* 68 Mich.App. at 714, 243 N.W.2d 923 (requiring "actual malice in the sense of oblique design or bad faith"), this Court believes that Michigan has now adopted the *New York Times* standard for all questions of qualified privilege including those privileges which do not involve members of the press or public figures. *See, e.g., Steadman v. Lapensohn,* 408 Mich. 50, 55, 288 N.W.2d 580 (1980); *Lins v. Evening News Association,* 129 Mich. App. 419, 434, 342 N.W.2d 573 (1983).

This Court agrees with defendants that the January 17 telex is entitled to a qualified privilege under Michigan law. The telex was sent by defendants in their capacity as union leaders to union members whose jobs may have been affected by the outcome of the proceedings. As representatives of those individuals, the defendants had a duty to inform them of the status of the bankruptcy proceedings. Thus, in order to prevail, plaintiff will have to demonstrate that Presser and the union sent the telex with actual malice—that they either knew the statements to be false or made them with reckless disregard for the truth. *Tumbarella,* 85 Mich.App. at 494, 271 N.W. 2d 284; *Lins,* 129 Mich.App. at 434, 342 N.W.2d 573. While plaintiff must establish that the defendants knew the information to be false at the time of publication, or that they were subjectively aware of a high probability that the information was false, *Lins* at 433, 342 N.W.2d 573, plaintiff need not prove the existence of actual malice by direct evidence. *Steadman,* 408 Mich. at 55, 288 N.W.2d 580; *Tumbarella,* 85 Mich. App. at 494–95, 271 N.W.2d 284. As the court noted in *Steadman,* "the actual malice necessary to defeat a conditional privi-

lege can be established by inference. Indeed, given the very subjective nature of the test for actual malice, circumstantial evidence may be the only kind available on the issue." 408 Mich. at 55, 288 N.W.2d 580. In *Tumbarella,* the court noted that where "reasonable minds could differ" as to the truth of the allegedly defamatory statements, summary judgment was inappropriate. *Id.,* 85 Mich.App. at 494–95, 271 N.W.2d 284.

In this case, plaintiff offers several arguments to demonstrate that defendants exceeded the bounds of their qualified privilege. First, the plaintiff notes that the locals had no need to be informed of the appointment of a trustee in the bankruptcy proceedings, or of the judge's reasons for doing so. Second, he points to the speed with which this information was disseminated to the locals, and argues that a defendant interested in conveying the truth to its members would have waited until a transcript of the hearing was available.

This Court is unwilling to say that the locals had no interest in being informed of the appointment of a trustee in the bankruptcy proceedings, or that they had no interest in knowing the judge's reasons for doing so. Further, the Court finds it difficult to believe that a reasonable person would have to wait several months for the preparation of a transcript before communicating the outcome of a judicial hearing to others interested in that event. Certainly the decision to inform the locals before the transcript was prepared could not be considered reckless in itself.

Several unanswered questions lead this Court to conclude, however, that plaintiff may be able to establish actual malice in this case. First, and most important, is the level of inaccuracy contained in the telex itself. Robert Baptiste's affidavit, submitted by defendant in support of its motion, states that the telex was prepared by Mr. Baptiste and was "based upon information provided by participants in the proceedings." Baptiste Affidavit at 3. We are not informed who attended the proceedings on the defendants' behalf, or whether this individual was an attorney. Mr. Bap-

tiste states that he had no reason to doubt the accuracy of the information included in the telex. *Id.* at 4. This Court finds it difficult to believe that any individual who was in the same room with Judge Howard during those proceedings could have communicated some of the statements contained in the telex—particularly item three, item ten, and the final paragraph of the telex (which relates to the charge that Tucker improperly diverted freight accounts to Central). Certainly any attorney in the room would have known that Judge Howard did not base his opinion on the diversion of accounts to Central, or upon the existence of excess managerial employees. These statements are so clearly inaccurate, in view of Judge Howard's findings, that the Court believes it need not accept Mr. Baptiste's bald assertion of good faith and subjective belief in the accuracy of his message.

■ Nor is the Court persuaded by defendants' argument that they could not have had the requisite malice since they were not personally involved in the preparation of the telex. The telex was prepared by an agent of the defendants. Baptiste Affidavit at 1. It was sent over defendant Presser's signature, and in his capacity as a Union leader. Any statements made in the telex and the state of mind of the individuals involved in its preparation may properly be attributed to the defendants for purposes of this action.

Given the level of inaccuracy in the telex itself, the Court believes that a reasonable jury could find that defendants sent the telex with at least reckless disregard for the truth of the statements contained in that message. The Court cannot say that plaintiff will be unable to present evidence on this issue, and thus, summary judgment is inappropriate. Moreover, a reasonable jury might infer, from the speed with which the message was sent, that defendants were reckless in checking the accuracy of their statements. While the Court agrees that defendants were not obligated to wait until a transcript was prepared, it seems clear that by the time of the January 16, 1984 hearing no one really believed that

Tucker was responsible for diverting accounts to Central. Indeed, by the time that hearing was held, the creditor's committee had withdrawn the accusation entirely. A reasonable jury could infer from these facts that defendants were reckless in believing that Judge Howard would have chosen that accusation as a ground for appointing a trustee in the bankruptcy proceedings. The jury could further infer that the defendants were reckless in sending the telex before checking on that particular statement.

Defendant's final argument with respect to Count V is that the telex is entitled to constitutional protection as a statement made in the course of a labor dispute. In *Linn v. United Plant Guard Workers*, 383 U.S. 53, 64–65, 86 S.Ct. 657, 664, 15 L.Ed.2d 582 (1966), the Supreme Court indicated that the *New York Times* standard ought to govern libel actions arising out of such disputes. Since this Court has already determined that the *New York Times* standard applies to this action through Michigan's law of qualified privilege, it will not reach this argument.

The Court concludes, therefore, that defendants' motions for summary judgment must be denied with respect to Count V of plaintiff's complaint. Plaintiff has established that genuine issues of material fact exist with respect to the defamatory nature of the January 17, 1984 telex, its relation to him, and the existence of actual malice on the part of defendants.

### B. *Count VII—Tortious Interference with Business Relations*

In order to prevail on this claim, the plaintiff must prove: (1) the existence of a valid business expectancy or relationship; (2) knowledge of the expectancy or relationship on the part of defendants; (3) an intentional interference by defendants causing a breach or termination of that expectancy; and (4) resulting damage to the plaintiff. *Meyer v. Hubbell*, 117 Mich. App. 699, 709, 324 N.W.2d 139 (1982); *Lucy v. Amoco Oil Co.*, 582 F.Supp. 1168, 1173 (E.D.Mich.1984). In *Feldman v. Green*, 138 Mich.App. 360, 360 N.W.2d 881

(1984), the court explained the intentional interference requirement as follows:

> [P]er se illegal acts by an interferor are not a prerequisite to liability under the tort of interference with contractual or business relations.... We hold ... that one who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified for the purpose of invading plaintiff's contractual rights or business relationship. Under the latter instance, plaintiff necessarily must demonstrate, with specificity, affirmative acts by the interferor which corroborate the unlawful purpose of the interference.

*Id.* at 369–70, 360 N.W.2d 881. Malice, in this context, refers to the "intentional doing of a wrongful act without justification or excuse." *Id.* at 370, note 1, 360 N.W.2d 881. Merely making a better offer than one's competitor will not suffice as proof of an improper interference. *Weitting v. McFeeters*, 104 Mich.App. 188, 197, 304 N.W.2d 525 (1981). On the other hand, the interfering act need not be illegal to establish liability. As *Feldman* holds, it is enough for the plaintiff to establish that the defendant took some lawful act with the purpose of maliciously and unjustifiably interfering with the plaintiff's prospective economic relationships. *Feldman*, 138 Mich.App. at 370, 360 N.W.2d 881.

Defendants make three arguments in favor of their motion for summary judgment with respect to count VII. First, they argue that plaintiff has failed to establish the requisite intentional act since the defendants were not personally responsible for the content of the telex. As the Court has already indicated, this argument is without merit. Since the telex went out under defendant Presser's name, in his official capacity as a union leader, both its content and the intent of its actual drafter may be attributed to defendants.

■ Second, defendants argue that plaintiff has failed to establish that they committed an unlawful or malicious act. This argument relies on the assumption that neither the January 17, 1984 nor the December 23, 1983 telex were defamatory. If plaintiff proves that he was defamed by either or both telexes, plaintiff will prove the necessary wrongful act. In *Wilkerson v. Carlo*, 101 Mich.App. 629, 635, 300 N.W. 2d 658 (1980), the court held that, "an action for tortious interference ... can represent a separate basis for recovery where defamatory statements represent the cause of damage." Unlike the defamation claim, this claim will require plaintiff to prove his damages with specificity. *Id.* at 632, 300 N.W.2d 658. *See also, Trepel v. Pontiac Osteopathic Hospital*, 135 Mich.App. 361, 377, 354 N.W.2d 341 (1984) (defamatory letters formed basis for relief). Since this Court has already held that plaintiff may be able to establish his case for defamation, and since defamation may provide the basis for Count VII of plaintiff's complaint, the Court finds that summary judgment is improper at this time.

Alternatively, even if plaintiff can not establish the defamatory content of either telex, plaintiff may be able to establish that defendants committed an otherwise legal act for the purpose of interfering with his future employment prospects. The cause of action for tortious interference with business relations includes interference with the prospect of obtaining employment. *Schipani v. Ford Motor Co.*, 102 Mich. App. 606, 621, 302 N.W.2d 307 (1981); *Wilkerson v. Carlo*, 101 Mich.App. 629, 300 N.W.2d 658 (1980) (plaintiff prevailed on showing blacklisting in the harness racing industry).

■ Plaintiff alleges in his third amended complaint that defendants distributed the telexes to individuals other than their local unions for the purpose of hampering the plaintiff's job search. While the court agrees that his evidence on this point is somewhat weak, the Court cannot say that plaintiff will be unable to substantiate his claim at trial. Alternatively, plaintiff argues that defendants distributed the telexes without taking any precaution to prevent their distribution to non-union members, while knowing to a substantial certainty that they would not be kept confi-

dential by the locals and that their widespread dissemination would hamper plaintiff's employment prospects. Plaintiff offers as evidence his inability to obtain employment in the trucking industry despite his many years of experience as a manager in that industry. Plaintiff states that he distributed over 350 resumes over a four-year period and never received a serious job offer in the trucking industry. Two individuals employed as employment counsellors in the industry testified that they found plaintiff's inability to find a job unusual. *See* Shapiro Deposition at 23; Petrero Deposition at 15. While this circumstantial evidence is somewhat weak, a reasonable jury might, taking all the facts in the light most favorable to plaintiff, conclude that defendants interfered with plaintiff's employment prospects either by distributing the telexes or other similar information to plaintiff's prospective employers, or by failing to insure that the information would not be distributed to those employers by individuals within their control.

Defendants make much of the fact that neither employment counsellor was aware of any blacklisting against plaintiff. This Court does not find this evidence particularly persuasive in defendants' favor. If there really was a blacklist, why would anyone tell a person outside the industry of its existence? Blacklisting is not only unethical, it may be illegal. One of the employment counsellors testified that if there was a blacklist, he would not be informed of it. Shapiro Deposition at 19. Neither ruled out the possibility that plaintiff's claims were accurate. The Court is unpersuaded that such activity could not occur in the trucking industry and believes that plaintiff's circumstantial evidence is enough to raise a question of fact as to the existence of such activity by the defendants.

■ Finally, defendants argue that plaintiff has failed to prove his damages, or the prospective relationship allegedly interfered with, with sufficient certainty. They argue that other factors, such as a slump in the trucking industry, deregulation and plaintiff's over-qualification for many available jobs explain plaintiff's inability to find work. Tortious interference with business relations requires proof of actual damages. *Wilkerson* at 632, 300 N.W.2d 658. Moreover, Michigan law requires that "a business relationship be proved with some degree of specificity, at least to the point that future profit be a realistic expectation and not merely wishful thinking." *Schipani v. Ford Motor Co.*, 102 Mich.App. 606, 622, 302 N.W.2d 307 (1981). In evaluating plaintiff's evidence on this point, the courts look to whether the "expectation of economic advantage allegedly interfered with was a reasonable one." *Id.* at 621–22, 302 N.W.2d 307. Plaintiff need not prove the existence of an enforceable contract; it is sufficient to show interference with specific third parties or an identifiable prospective class of third persons with whom plaintiff had a reasonable expectation of contracting. *Id.*

In this case, plaintiff alleges that he had a reasonable expectation of obtaining further employment as a manager in the trucking industry since he had several years of experience working in that industry and since, prior to the alleged interference, his reputation in that industry was generally good. He alleges that defendants were aware of this expectation, since they knew of his experience and his good reputation. He further alleges that the December 23, 1983 and January 17, 1984 telexes were calculated, at least in part, to damage that reputation for the purpose of preventing him from finding further employment in the trucking industry.

Defendants argue that plaintiff has been unable to produce a single prospective employer willing to testify that he or she declined to employ plaintiff due to the improper actions of defendants. Again, the Court does not view this evidence as particularly persuasive. As is the case in many employment discrimination actions, direct evidence of ill will or malice toward a particular individual is likely to be nonexistent. Even if plaintiff's allegations are true, it would be highly unlikely that any individual would testify to that effect on his behalf. In fact, if plaintiff's allegations are true, the Court would be extremely surprised to

receive direct evidence on that point, since any individual supplying such evidence might themselves be subject to similar treatment by defendants. The Court does not wish to imply that it believes plaintiff's allegations to be true. It only states that, assuming them to be true, the lack of direct evidence on the point is not unsurprising, nor is it fatal to plaintiff's claim.

Moreover, plaintiff has identified the requisite class of third persons with whom he had a reasonable expectation of contracting —other trucking firms. In *Wilkerson, supra,* evidence that an individual was the subject of an industry-wide blacklist was sufficient to state a cause of action for tortious interference with business relations. 101 Mich.App. at 635, 300 N.W.2d 658. While the industry involved in this action is larger than the industry involved in *Wilkerson,* it is still a relatively small community where one's reputation would be a valuable tool in finding employment.

This Court finds that a reasonable jury could conclude that plaintiff had a reasonable expectation of finding employment in the trucking industry. Plaintiff has established that he had this expectation with respect to a specific class of third persons —other managers in the same industry. While direct evidence of causation is lacking, the jury could infer causation from plaintiff's circumstantial evidence relating to his job search and his inability to find further employment in the industry.

### Conclusion

For the reasons discussed above, the Court concludes that genuine issues of fact remain with respect to both of the challenged counts. Therefore, the Court will deny defendants' motions for summary judgment.